SIMMONS, Successor, etc., *v.* TAYLOR, Successor, etc., and others. (Cross-Bill.)[1]

*(Circuit Court, S. D. Iowa, C. D.* May 12, 1885.)

1. RAILROAD MORTGAGES—FORECLOSURE PROCEEDING—EQUIPMENT AND INCOME MORTGAGE—BURLINGTON, CEDAR RAPIDS & MINNESOTA RAILROAD COMPANY.
   On examination of the proceedings heretofore had in this case, *held,* that the second, or income and equipment, mortgage was not foreclosed, and the rights of the holders of bonds secured thereby cut off by the decrees and sales, and that the bondholders were not estopped from asserting their rights under such second mortgage.

2. SAME—ESTOPPEL.
   A party is not estopped for remaining silent or inactive when he is under no obligation, legal or moral, to speak or act.

In Equity.

Prior to 1875 the Burlington, Cedar Rapids & Minnesota Railroad Company had constructed a main line and three branches, the latter known, respectively, as the Milwaukee Division, the Muscatine Divis-

[1] See 8 Sup. Ct. Rep. 58, *Sub nom* Burlington, C. R. & N. Ry. Co. v. Simmons.

ion, and the Pacific Division. Upon the main line and upon each of its branches, separately, it had placed a first mortgage. The trustee in the mortgage on the Pacific branch was the Farmers' Loan & Trust Company. All these mortgages were executed prior to the first of June, 1874. On that day it executed to said Farmers' Loan & Trust Company, as trustee, a second mortgage covering the road and all its branches, and given to secure what it denominated income, equipment, and convertible bonds. This mortgage purported to be a first lien upon the entire net income, upon 130 box cars, being those numbered by all even numbers from 882 to 1,140, and upon engines numbered 30 and 31, as well as a second lien upon all the property covered by the various first mortgages herein before referred to.

Defaulting in the payment of interest on these several mortgages, on the fifteenth of May, 1875, a bill of foreclosure of the first mortgage on the main line was filed in the circuit court of the United States for the district of Iowa. At first the only party defendant was the Burlington, Cedar Rapids & Minnesota Railway Company, but on July 5, 1875, by amendment, the Farmers' Loan & Trust Company, trustee in the second, the income and equipment, mortgage was also made a party defendant. A demurrer to this bill was filed by the defendants. Similar bills of foreclosure were filed to foreclose the mortgages on the several divisions. In that to foreclose the mortgage on the Pacific Division the Farmers' Loan & Trust Company, trustee, set up not merely its first mortgage on that division, but its income and equipment mortgage, or second mortgage, upon all the divisions.

Matters stood in this condition until the thirtieth day of October, 1875. On that day decrees were entered. In the Pacific Division case, the decree, after finding the amount due on the bonds and coupons secured by the first mortgage to the Farmers' Loan & Trust Company, ordered the payment of that amount within 10 days by the railway company to the mortgagee, and in default thereof that the property described in and conveyed by said mortgage be sold by a special master, "appointed to execute this decree, and make such sale as herein directed to satisfy said bonds, coupons, costs, fees, and expenses of this suit remaining unpaid," and that, after approval of the sale, the master executed a deed to the purchaser, and also awarded a general execution against the railway company for any deficiency which might exist after such sale. The only reference in the decree to the income and equipment mortgage is found in these words:

"That portion of complainant's bill relating to the income and equipment mortgage, so called, is ordered to be consolidated with the causes pending in this court against some respondents, wherein said Frost, Taylor, and others are, respectively, complainants."

The three other first mortgage cases were consolidated and one general decree entered. That decree contains the order of consolida-

tion; then, after reciting that the defendant, the railway company, withdraws its demurrers, pleas, etc., and urges nothing in bar of the relief sought by the several complainants, goes on to find the amounts due upon said three first mortgages, directs the payment of such several amounts by the railway company within 10 days; "or, in default thereof, that *its* equity of redemption is barred," and, in further default thereof, orders sale of the respective properties mortgaged. It provides for a report of the sales, confirmation, and deeds by the master. In reference to the Farmers' Loan & Trust Company, and its income and equipment mortgage, and after the order made in respect to each first mortgage, appears this language:

"And this decree is made subject to the rights of any intervening creditors now before this court. And the claim of the Farmers' Loan & Trust Company on the income and equipment mortgage to any of the cars or machinery named in the same is to be submitted to this court in term time, or vacation, as soon as counsel can agree on the facts in relation thereto. Any dispute among the holders of the four mortgages foreclosed, including the Pacific Division, as to cars and machinery, if not settled by themselves, is to be determined by the court at the next term. And the receiver now in possession is required to operate and preserve said property for the benefit of the bondholders seeking to foreclose this mortgage; and he is required to make a report, and adjust his accounts of receipts, expenditures, and contracts made by him up to the date of said sale; and any residue in his hands is to be paid to the master and credited to the mortgage debt up to that date; and if said property shall not sell for sufficient to pay said debt, interest, and costs, the said plaintiff may have a general execution for the residue against the said Burlington, Cedar Rapids & Minnesota Railway Company."

And at the close of the decree is this general reservation:

"The court reserves the power to make further orders and directions; and no sale under this decree is to be binding until reported to the court for its approval."

This is the entire reference made in this decree to this income and equipment mortgage and to the claim of the Farmers' Loan & Trust Company, and the only language therein which can bear upon or affect the questions to be hereafter considered.

In this consolidated case, on the day of the decree, October 30, 1875, there was filed an answer and cross-bill by the Farmers' Loan & Trust Company, and on November 22, 1875, the complainants filed a replication to such answer, and an answer to such cross-bill. In these pleadings of the Farmers' Loan & Trust Company, the execution of the second mortgage above referred to is set forth, and it is alleged that $1,200 of the bonds secured thereby have been sold and disposed of, that the interest thereon has not been paid, and that the entire sum, principal and interest, is declared to be due. It does not appear that there was ever any agreement of counsel, any submission to the court, or any action taken by the court as to the specific matter reserved in the decree in the consolidated cases as to the claim of the Farmers' Loan & Trust Company to cars or machinery. Nor

was there any order or decree ever entered upon the cross-bill, and the answer thereto, or any action appearing of record taken by the court in respect to these later pleadings, or the issues presented by them.

In pursuance of those decrees in the summer of 1876, the masters, after due advertisement, sold the main line and the several branches to a committee of the bondholders. Those sales were reported to the court with a proposed plan of reorganization, which sales were confirmed and deeds made in pursuance thereof. The proposed plan of reorganization contemplated a distribution of the stock and the bonds of a new company, to be known as the "Burlington, Cedar Rapids & Northern Railway Company," according to certain specified proportions, to the holders of the first mortgage bonds on the main line and several divisions. No reference was made in this plan to the income and equipment mortgage, or the bonds secured thereby. All of that matter was simply ignored. The sales having been confirmed and the deeds passed, the reorganization was perfected, the stock and bonds issued, distributed according to the proposed plan, and put upon the market for sale. This was in the year 1876. It further appears that most, if not all, the holders of these income and equipment bonds, secured by the second mortgage, were owners and holders of first mortgage bonds, and participated in the reorganization to the extent of surrendering such first mortgage bonds and taking bonds in the new company. The trustee in the mortgage issued by the new company was the Farmers' Loan & Trust Company, the trustee in this income and equipment mortgage. It accepted the trust conferred by this new mortgage, and took no further action in reference to the income and equipment mortgage, or in enforcing the rights, if any there were remaining to the holders of the bonds secured thereby.

Matters remained in this condition until April, 1883, when certain holders of those bonds presented in this court a petition for the appointment of Charles E. Simmons as trustee in said mortgage, in place of the Farmers' Loan & Trust Company, which petition was granted, and thereupon the said trustee filed his amended cross-bill setting forth the various proceedings heretofore stated, and praying for the finding of the amount due upon the income and equipment mortgage, and the redemption of the property from said master's sales. It further appears that all of said income and equipment mortgage bonds, or at least nearly all, were issued to the various holders thereof simply as collateral security for debts owing by the mortgagor company.

*Hubbard & Clark*, for complainants in cross-bill.

*Ransom, Bral & Withrow*, for defendants in cross-bill.

BREWER, J. The first question is whether this second mortgage, this income and equipment mortgage, was foreclosed, and the rights of the holders of bonds secured thereby, cut off by the decrees and sales. Obviously not. In the Pacific Division mortgage case, the

claim of the second mortgage was, by the term of the decree, transferred to the consolidated cases. While the Farmers' Loan & Trust Company was the trustee in both the second mortgage and the first mortgage on the Pacific Division, yet, so far as that decree is concerned, it stands as though there were not only two separate mortgages, but two separate trustees. The first mortgage was foreclosed; the second mortgage, and all claims thereunder, transferred to another case. There was no decree barring the claim of the second mortgagee; there was no finding of the amount due on such second mortgage; there was no order of sale to satisfy said mortgage. In brief, the only reference to such second mortgage was the transfer of it, and all claims thereunder, to another suit. Upon what, then, can it be pretended that so far as this income and equipment mortgage was a second lien upon the Pacific Division, it was foreclosed, and the rights of the holders of the bonds secured thereby cut off by this decree?

Turning now to the decree in the consolidated cases, there affirmatively appears a waiver by the railroad company, the mortgagor, of all defenses, and a decree barring its equity of redemption in default of the payment of the mortgaged sum within 10 days after the decree, a finding of the amount due under these three first mortgages, an order requiring the payment of such sums within 10 days, and an order for a general execution for any balance of such sums not realized upon the sales ordered; in short, everything to show a foreclosure of those prior mortgages, and an omission of all of those matters in respect to this second mortgage. There is no finding of the amount due under this second mortgage; no order that the mortgagor pay any such amount; no order for an execution for any balance of such amount not realized upon sale; no order barring the second mortgage of its equities in the matter; no decree of foreclosure against it; in fact, no other reference to this second mortgage than in the simple reservation for future determination by the court of so much of its claim as asserted a first lien upon certain specific personal property. Now, at the time of this decree there was pending before the court an answer and cross-bill of this second mortgagee by which all its rights were presented. The decree ignores them except as to a little matter of alleged priority in respect to some personal property. Did the parties understand that this second mortgage was foreclosed, that the rights of such second mortgagee were cut off by this decree? Obviously not. Beyond the silence of the decree itself is the fact that within a month the complainants filed answer to its cross-bill and replication to its answer. Obviously they understood that there was pending for adjudication the claim of a second mortgage.

Counsel in this case has argued strongly that there is such a difference between the old proceedings for strict foreclosure and the ordinary proceedings of to-day for foreclosure by sale that a sale cuts off all rights of every party to the suit. That proposition is too broad.

I agree that every right presented and adjudicated for or against any mortgagee or mortgagor is determined by the decree, but I cannot agree that a right presented by bill or cross-bill and unnoticed in the decree, and not absolutely necessary for determination in the decree, is determined by the simple fact that the party presenting it is in court. The rights of the various parties to a foreclosure suit are determined by the nature of the decree entered. And nothing is determined which is not expressly determined, or which is not impliedly settled by the terms of the decree in fact entered. Other matters emphasize this conclusion. A certain minor claim in this second mortgage was reserved for consideration upon facts to be thereafter found or agreed upon. This indicates that the existence of this second mortgage was known to the court at the time, and that the cross-bill setting it up was also known, and that by the rules of equity pleadings no determination of this claim could be had at that time without consent, and that the parties, not consenting, in respect to the general claim, had arranged in reference to this specific minor matter. Obviously, then, all parties understood that the general claim for a second lien was open for further consideration.

Again, its claim is stated along-side of the claims of intervenors, as though in respect to priority its claim to certain engines and cars stood upon the same footing as that of an intervenor, and that its second mortgage lien was not intended to be settled by this decree. Further, in the title of the cases in this consolidated case, no reference is made to the complainant in the cross-bill; nothing to indicate that such cross-bill was by consent, or otherwise, before the court for hearing and decree.

If I am at liberty to go outside of the record and turn to the oral testimony which is presented, it is equally obvious that at the time of this decree all parties interested regarded the second mortgage as of little moment. All thought that the first mortgages were so large as to sweep the entire property and leave large balances for general execution, and that hence a foreclosure of the second mortgage was a matter of little or no moment. The only thing deemed worth noticing was this claim to a priority as to a few cars and engines. Hence, testing the question by either the record itself alone, or also by the extrinsic facts, I am clear in the opinion that this second mortgage was not in fact foreclosed, and was not intended to be foreclosed at the time of and by this decree. Doubtless there was gross carelessness on the part of counsel for complainants in not having the second mortgage and the claims thereunder adjudicated, determined, and foreclosed, but their obvious carelessness does not change the fact as to what was done or intended to be done at the time.

Now, if the decrees themselves contain no foreclosure of this second mortgage, how can the sales, and the confirmation of such sales, cut off such second mortgage, or the rights of the bondholders thereunder? The sale goes not beyond the decree. It takes nothing and

carries no rights which the decree does not determine and prescribe; so I have little doubt that when the sale was consummated all that was accomplished was a foreclosure of the first mortgage, leaving all rights secured by the second mortgage undetermined and unforeclosed.

The second question presented is this: Conceding that, as a matter of strict law, this second mortgage was not foreclosed, nor the rights of the holders of bonds secured thereby cut of, yet it is claimed that there is an equitable estoppel against any present assertion by such bondholders. A most elaborate and able argument has been presented by counsel upon this matter of estoppel. I think these propositions answer his argument:

First, a party is not estopped by remaining silent when he is under no legal or moral obligations to speak. Estoppel implies that the party has done, or omitted to do, that which, under the circumstances, he was legally or morally bound to do, or omit doing. If the party is under no obligations to speak, no estoppel can spring from his silence. If he is under no obligations to act, his failure to act concludes none of his rights. Now, I understand it to be accepted law that a second mortgagee is not bound to insist upon a foreclosure of his mortgage. It matters not whether the first mortgagee forecloses or not. The second mortgagee owes no duty to anybody to act. If the first mortgagee wishes to cut off his equity of redemption, it is the duty of such first mortagee to make him a party and to take a decree against him; and if he fails to do that the second mortgagee is not concluded. The mere fact that he is made a party casts no obligations upon him. He may remain silent, and if no decree is taken against him, his rights remain as though he had not been made a party. No one would pretend that if not made a party his rights are cut off by his mere failure to come into court and ask to be made a party. In other words, in all proceedings by the first mortgagee, the second mortgagee stands on the defensive. His rights are perfect unless at the instance of the first mortgagee they are affirmatively cut off, or lost through the running of the statute of limitations.

Now, in this case the second mortgagee is a party. He sets up his mortgage. The first mortgagee takes a decree for the sale of the property to satisfy his mortgage, a decree barring the mortgagor, but not barring the second mortgagee; takes no foreclosure of such second mortgage; no finding of the amount due under such mortgage, and no order for the sale of the property to satisfy such second mortgage. Is the second mortgagee guilty of any wrong in not insisting upon a foreclosure of his mortgage? Is it not time enough for him to act when the first mortgagee demands some adjudication against him? May he not remain silent until such prior mortgagee asks foreclosure? That seems a clear statement of his rights, and I do not understand that any of the many cases cited by the learned counsel go so far as to hold that a party is estopped for remaining silent or in-

active where he is under no obligations, legal or moral, to speak or act.

Again, counsel spoke in argument, and have in brief, about the ambiguity of this decree, and of the consequent obligation on the second mortgage arising from such ambiguity. The entire record is a matter of public knowledge. Taking such record in its entirety, and I cannot doubt as to what is disclosed thereby, I cannot see that that ambiguity exists of which counsel speak. Neither mortgagor nor mortgagee, first or second, had any peculiar means of knowledge. The record was there and spoke for itself, and everybody was bound to take notice of what it disclosed. It did not show a foreclosure of this second mortgage. It does not purport to do so. It disclosed a cross-bill filed on the day of the decree with an answer thereto filed nearly a month thereafter. Who examining such a record can say that he was misled? The other matter of estoppel is this. The holders of some of these second mortgage bonds, as appears, were also holders of first mortgage bonds, surrendered such first mortgage bonds, and received bonds and stock in the reorganized company. But upon this, what estoppel arises? It is not pretended that they represented to anybody that they did not have these second mortgage bonds, or that they waived any claim by reason thereof, when they surrendered the first mortgage bonds. They may have thought, as others seem to have thought, that the property was worth so much less than the first mortgage bonds that nobody would ever think of the second mortgage. They had a legal right to surrender the first mortgage bonds, and take their interest in the new company; and when they said nothing, or did nothing, and exercised a plain legal right, how can it be said that some other legal right which they possessed, they abandoned? How does estoppel arise under these facts?

I am clearly of the opinion that all this trouble has arisen from the gross negligence of counsel, Messrs. Grant & Smith, and much as I should like to sustain this claim of an estoppel, I am unable to see any legal grounds therefor, and must hold that this second mortgage stands to-day unforeclosed, and the bondholders not estopped from asserting their rights.

The question then arises whether this second mortgagee has an absolute right of redemption, and that is what is prayed. I think not. Neither a first or second mortgagee holds title or has absolute right of redemption as against the other mortgagee. The mortgagor alone has that right. When it makes a voluntary conveyance, or when its title is conveyed by judicial sale, the purchaser may succeed to such right of redemption. Regarding the foreclosure proceedings as completing mere execution sales, it would seem that the present holders have succeeded to the redemption right of the mortgagor. Whether that be universally and absolutely true or not, I think the right of redemption is one which a court of equity may award. It cannot be that the sec-

ond mortgagee has a settled legal and indisputable right thereto. Under the modern idea of mortgages, the mortgagee takes no title,—simply a lien. If he gets his money, all that he has a legal right to is secured. In this case it would seem that equity requires that the present holders of the title obtained by this foreclosure sale should have the right of redeeming from the lien of this second mortgage; and so the order should be that when the amount due under this second mortgage is ascertained, it is to be declared a lien upon the properties mortgaged, and that if not paid within a certain time the properties be sold to satisfy such lien. Such a decree would preserve the rights of the first mortgagees, as well as all rights secured by any parties subsequently obtaining interest in the property.

One further question requires notice. Obviously most, if not all, of the bonds secured by this second mortgage were issued as collateral security for certain debts of the mortgagor. Should such bonds to-day be treated as valid obligations for their face and interest, or as binding only to the extent of the debts secured thereby? I think the latter. Take the bonds held by the Lackawanna Iron Company, for instance. They were given as a collateral security only, and the present holder took them under such circumstances as to charge him with notice. Instead of being a debt for their face, all that the present property should be held liable for is the amount of the debt due to the iron company secured by these bonds. So in respect to others.

The order therefore should be that the matters be referred to the master of this court, to state—*First*, which of those bonds secured by this second mortgage were issued simply as collateral security for debts of the mortgagor; *second*, the present value of the debts secured thereby; and, *third*, if any of those bonds have been transferred from the holders of such debts, under what circumstances, and for what consideration they passed to the present holders. Upon the coming in of such report of the master, and finding of the amount which is properly secured by this second mortgage, a decree will be entered directing the sale of the mortgaged property within 60 days to pay such amount.

Costs will follow this cross-bill, and be charged upon the property.